## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ROMONE QUEEN<br>10 35th Street SE, #101<br>Washington, D.C. 20019<br><br>OCTAVIA MERCER<br>5015 Jay Street NE, #12<br>Washington, D.C. 20019<br><br>     Plaintiffs,<br><br>          v.<br><br>THE DISTRICT OF COLUMBIA,<br>1350 Pennsylvania Avenue NW<br>Washington, D.C. 20004,<br><br>Officer PETER REUTER<br>Sergeant ERNEST GRANT<br>Officer DWIGHT JONES<br>Officer SULTAN SHAKIR<br>Metropolitan Police Department<br>Sixth District,<br><br>John Doe Officers 1–10,<br><br>     Defendants. | Case No. 1:15-cv-1518<br><br>Jury Trial Demanded |

### COMPLAINT

1.     On October 25, 2013, Romone Queen received a frantic phone call from his girlfriend Octavia Mercer, who was home alone at Queen's apartment waiting for him to return from work.   Queen heard a commotion from Mercer's end, and then suddenly the phone went silent.   As Queen would later learn, approximately ten Metropolitan Police Department ("MPD") officers had violently shoved in Queen's door, knocking Mercer to the ground. They then tackled and pinned her down for several minutes as officers with their guns drawn swarmed over her and into the house.   Mercer was handcuffed and held in the living room as at least 10 heavily armed

1

male officers surrounded her, yelling obscenities and threatening her with what they called "guilt by association." After a worried Queen rushed home, MPD officers immediately arrested him and repeatedly accused, demeaned, and threatened him.   The officers viciously ransacked the home, and Mercer and Queen were taken to jail and forced to spend approximately nine hours in solitary confinement without water or access to bathroom facilities.  As a result of the terrifying raid, Mercer was forced to leave her job and Queen almost lost his home.

2.      Neither Queen nor Mercer was suspected of any wrongdoing.  MPD officers had no facts or evidence that any illegal activity had occurred in the home at any time.

3.      Still, approximately 10 MPD officers forcibly entered the Queen home and searched through the couple's belongings in pursuit of drugs, guns, and records related to a sophisticated narcotics trafficking operation.   They did so based on a fraudulently obtained warrant written after a street stop on an unspecified date involving Reginald Bailey (Queen's younger brother) — someone who does not reside at the Queen residence.

4.      Based on the dateless search warrant application, it is impossible to tell whether the street stop of Reginald Bailey occurred within the same week, month, or even the same year as the home invasion that it supposedly authorized.

5.      The search warrant application lacks even a *single* particularized fact suggesting that drugs, records, guns, or other contraband would be present in Queen's home.  Instead, the search warrant application relies on two things: (1) at an unspecified time in the past, cash and a substance appearing to be PCP were found in connection with Queen's younger brother, Reginald Bailey, and (2) officer Peter Reuter's generic and conclusory claims that, based on his "training" and "experience," it is common for individuals who deal in narcotics to maintain books, records, receipts, bank records, photographs, and other contraband in "locations where

they will have ready access to them," such as their residences.

6.      During the course of the unlawful home invasion, officers humiliated, traumatized, verbally taunted, and physically abused vulnerable people completely innocent of any wrongdoing.  It took numerous days for the couple to undo the destruction and mess that MPD officers inflicted on their home.

7.      What happened to Mr. Queen and Ms. Mercer raises grave concerns regarding the systemic misconduct and recklessness of the MPD in obtaining and executing search warrants in the District of Columbia.[1]

## Nature of the Action

8.      The plaintiffs seek punitive damages and compensatory relief for the violations of their constitutional rights that occurred as a result of the MPD's violent home invasion.

## Jurisdiction and Venue

9.      This is a civil rights action arising under 42 U.S.C. § 1983 and the Fourth Amendment to the United States Constitution.  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

10.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391.

## Parties

11.     Plaintiff Romone Queen is a 34-year-old government employee who operates a school bus for special needs children in the District of Columbia school system. Plaintiff Octavia Mercer is a 27-year-old social worker who assists adults with developmental disabilities.

12.     Officer Peter Reuter prepared and swore under oath the search warrant application and participated in the planning and execution of the home raid.

---

[1] The allegations in this Complaint are based on personal knowledge as to matters in which the plaintiffs have had personal involvement and information and belief as to all other matters.
[2] This deliberately broad term has little coherence as a general category of people with consistent habits.  Indeed,

13.     Sergeant Ernest Grant, Officer Dwight Jones, and Officer Sultan Shakir are MPD officers that participated in the planning and execution of the home invasion.

14.     John Doe Officers 1–10 are the MPD officers that participated in the planning and execution of the home invasion.   Defendants Reuter and the District of Columbia are in possession of the full names and badge numbers of Defendant John Doe officers, and their full identities can easily be discovered.   All of the defendant officers are sued in their individual capacities.

15.     The District of Columbia is the municipal entity responsible for operating the Metropolitan Police Department and for training and supervising the Defendant officers.

## Factual Background

## The Lack of Probable Cause

16.     The warrant application made and relied on by the defendants was lacking in any information meeting standards of probable cause that have long pervaded this country's legal system.   *See generally* Exhibit 1.   No reasonable officer could have believed that it established probable cause to search the couple's home.

17.     According to the warrant application, *see* Exhibit 1, an undercover MPD officer observed Reginald Bailey in Washington, D.C., on an unknown date.   The officer claimed to see Bailey dip two cigarettes in a liquid vial and exchange them for money with a young woman on the street.   He then claimed to see Bailey replace the clear vial from "whence he retrieved it." Three MPD officers, including Defendants Reuter and Grant, subsequently stopped Mr. Bailey on the street and subjected him to a search.

18.     According to the warrant application, the resulting search of Mr. Bailey's person revealed a box of cigarettes and cash.   A search of the area where Mr. Bailey was purportedly

observed selling cigarettes revealed a small vial of tan liquid with an odor similar to that of PCP.

19.     The warrant application stated Mr. Bailey advised officers of his home address as 10 35th Street SE, Apartment 101, Washington, D.C. 20019 ("10 35th Street") and that the Court Services and Offender Supervision Agency identified Mr. Bailey's address as such.

20.     The warrant application contained no evidence of any illegal activity ever occurring at 10 35th Street.

21.     The warrant application contained absolutely no connection to the home at 10 35th Street residence other than that a police officer had found contraband during a street stop in connection with someone who the officer believed to live there.

22.     The warrant application contained no other evidence of Mr. Bailey being involved in a significant drug distribution enterprise.

23.     Mr. Bailey was not a resident at the 10 35th Street residence.  Romone Queen had instructed his younger brother not to use the 10 35th Street address for any purpose.

24.     Romone Queen and Octavia Mercer were not apprised of Mr. Bailey's whereabouts at any given time and were unaware that he possessed or purportedly sold drugs.

25.     The warrant application contained no evidence whatsoever that the residents of 10 35th Street, Romone Queen and Octavia Mercer, were involved in a drug distribution enterprise or even had criminal records.

26.     Not a single particularized fact connected any 10 35th Street resident to any illegal activity.

27.     In the absence of a single particularized fact supporting probable cause to believe that evidence of criminal activity would be found at the home, the application instead relied on an officer's statements of "training" and "experience."   These statements were woefully

insufficient to establish probable cause and were knowingly and recklessly false and misleading.

28.     Defendant Reuter asserted that, because of his training, experience and "participat[ion] in over 100 narcotics arrests," he knew that persons who deal in controlled substances maintain "books, records, receipts, notes, ledgers, bank records, money orders," and other papers relating to the "importation," "manufacture," "ordering," and "distribution" of illegal substances in places where they will "have ready access to them, such as in secured places within their residence, the residences of friends, family members, and associates, or in the places of operation of drug distribution activity' such as a stash house or safe house." *See* Exhibit 1 at 1.  In order to expand the search to the most private and personal aspects of Romone Queen and Octavia Mercer's lives, Defendant Reuter claimed that it is common for such records to be maintained on "computers, cellular telephones, PDAs often called 'Palm Pilots,' and laptop computers and other personal electronic devices." *Id.*

29.     Further based on his "training" and "experience," Defendant Reuter claimed that persons involved in illegal controlled substances keep a variety of items and documents serving as evidence of the "accumulation and disposition of proceeds of narcotics trafficking and illegal weapons," such as "photos of themselves, their associates, their property, and illegal contraband," "addresses and/or telephone numbers for their associates in their illegal organization," "precious metals, jewelry, and other items of value," "credit card and hotel receipts, plane and bus tickets and receipts, car rental receipts, accounts and records in fictitious names, [and] false identification." *Id.* at 1–2.  For each of these items, Defendant Reuter claimed that such evidence is often found in a variety of locations such as the "residence of friends, family members, or associates, or in the places of operation of the drug distribution activity." *Id.* at 1–2.

30.     Based on his "training" and "experience" in narcotics arrests, Defendant Reuter claimed that persons involved in the "sale and distribution of illegal controlled substances, particularly cocaine base," commonly possess "contraband related to the activity, such as scales, razors, packaging materials, cutting agents, cooking utensils, microwave ovens, pots, dishes, and other containers" and "large quantities of cocaine hydrochloride . . . because it is a necessary ingredient in the production or manufacture of cocaine base" in a variety of probable locations. *Id.* at 1. Defendant Reuter's warrant application makes no attempt to explain why an individual suspected of selling liquid PCP gives cause to believe that that individual also operates a crack cocaine laboratory. Defendant Reuter failed to offer a shred of evidence suggesting that Mr. Bailey was involved in the sale and distribution of crack cocaine, or why it would be more likely to find such evidence at Romone Queen's home rather than any other location Mr. Bailey could conceivably "have ready access to," such as the "residences of friends," "associates," or in a "stash house or safe house."

31.     Defendant Reuter's warrant application then sought permission to execute what amounted to an unlimited, unrestricted, colonial-era General Warrant to search the home and all electronic devices found at 10 35th Street (again, where Reginald Bailey did not even live).

32.     Defendant Reuter's assertions of "experience" and "knowledge" were plainly insufficient, self-defeating, false, and recklessly misleading.

33.     The application asked for a warrant to search the home at 10 35th Street because Defendant Reuter claimed to know that "individuals who deal in illegal controlled substances" keep items at their residences. Defendant Reuter knew these assertions to be untrue and misleading. Indeed, in the same warrant application, Defendant Reuter claimed that based on his "training" and experience," contraband and records are kept where dealers "have ready access to

them" and offered dealers' residences simply as an example of *one* such location.   *See id.* at 3.

Officer Reuter failed to offer evidence as to why the likelihood of drugs or records being kept in

a personal residence is any higher than the likelihood of drugs being kept in any other

conceivable location to which a narcotics dealer would have "ready access to," such as "the

residences of friends, family members, and associates, or in the places of operation of drug

distribution activity such as a stash house or safe house."   Specifically, Defendant Reuter failed

to give a single particularized fact as to why it would be more likely to find evidence of a crime

at 10 35th Street as opposed to any other location Mr. Bailey could conceivably have "ready

access to."

34.      In many dozens of other warrant applications sworn by MPD officers to different

Superior Court judges in the two-year period surrounding the warrant application in this case,

MPD officers claimed under oath, based on the same "training" and "experience," that a broad

category of people referred to as "drug traffickers"[2] attempt to hide the evidence of their criminal

activities in other places that are *not* their own home.   Defendant Reuter did not inform the

issuing judge that, based on the MPD training and experience of the dozens of other officers

seeking similar warrants, officers believed that there were numerous different places where a

drug dealer might possess those same items.   The "training" and "experience" asserted by other

MPD officers in different sworn warrant applications was exactly the opposite: that drug

---

[2] This deliberately broad term has little coherence as a general category of people with consistent habits.  Indeed, MPD officers are trained and routinely testify about the very different habits of different types of drug dealers.  For example, a small-time neighborhood dealer on a D.C. corner is far less likely to keep sophisticated computerized records of transactions or detailed financial banking records than a high-level multi-state or international manager of a drug-distribution enterprise.  By deliberately obfuscating the many distinctions between different types and levels of drug sellers, Defendant Reuter falsely portrayed low-level dealers, who are exceedingly unlikely to keep any of the materials allegedly sought in their family's home, as having the same habits as would a cartel kingpin.

The results are violent home raids in which MPD officers claim, as in this case, the authority to examine every piece of paper, every private bank record, and every file on any computer that they find, even though they had never received a specific warrant to search through those electronic devices that contain the entire living records of the home's residents and even though such records are extremely unlikely to be in the places being searched.

traffickers routinely store these same items in stash houses, the homes of friends, the homes of business associates, the homes of relatives, or other locations.

35.     Defendant Reuter also knowingly failed to inform the issuing judge that it is the training and experience of MPD officers that actual drug dealers routinely store evidence of their crimes at places that are *not* their residences or their relatives' residences so as to hide them from police and rivals.  Many MPD officers routinely testify and swear under oath that, for these reasons, drug dealers store evidence at places other than their homes and provide "clean" addresses to police.

36.     The conclusion of the application asked for a warrant to search the 10 35th Street home because of the purported habit of "individuals who deal in illegal controlled substances" to keep things at their residences.  Defendant Reuter knew those vague assertions to be untrue and misleading.  Indeed, numerous times throughout the same warrant application, Defendant Reuter asserted, based on his "training" and "experience," that drug dealers usually keep such items in a variety of *other* additional places, including "the residences of friends," or the homes of "family members," or the homes of "associates," or "in the places of operation of the drug distribution activity, such as a stash house or safe house."  *Id*. at 1-2.

37.     Defendant Reuter also knowingly failed to report to the issuing judge that many D.C. residents, particularly low-income residents, do not have a stable residence and live between multiple homes.

38.     Statements of "training" and "experience" thus purportedly give agents of the District's government the ability to raid and search multiple homes and other locations for every traffic stop or street arrest in which they find contraband.

39.     The practical and logical result of these assertions is that, if a person is stopped on

the street anywhere in the District carrying a handgun or an amount of drugs that MPD officers assert to be consistent with a drug sale, the MPD has trained its officers to claim the right to invade the entire home of any person who is related to that person, any person who is friends with that person, or any person who associates with that person, not to mention various other locations, such as vehicles and other storage areas commonly used to "stash" materials.  In a similar recent case in this Court, the MPD has taken the position that it is then permissible to strip search and probe the genitals of any person that is then found in that home, regardless of whether that person has ever had anything to do with any criminal activity.

40.     The MPD's training scheme and policies mean that any District resident, by virtue of having a drug "criminal" or gun owner in her family or among her acquaintances, has unknowingly subjected all of her life's possessions to a violent raid by government agents.  The act of government agents rifling through every single one of a life's accumulated possessions — medical records, books, food from the refrigerator, family photographs, bathroom supplies, bed sheets, mattresses, couches, pieces of artwork, computers, phones, and every item that helps to form a person's identity — is a traumatic experience that should only be allowed for good, particularized reasons.

41.     The experience of Romone Queen and Octavia Mercer illustrates this phenomenon.  Defendant Reuter's assertions in the warrant application show he had no probable cause to believe that evidence of a drug enterprise would be present in the Queen home rather than any of the numerous places that Mr. Bailey could conceivably have "ready access to." According to Defendant Reuter and other MPD officers themselves, drug criminals are known to hide contraband in *any one* of a virtually limitless set of possible locations.   Furthermore, Defendant Reuter made no attempt to establish probable cause in support of his assumption that

persons suspected of selling PCP also maintain crack cocaine laboratories.  Neither he nor any reasonable officer could have believed probable cause existed for finding evidence relating to such an operation in the possession of Mr. Bailey, much less in Romone Queen's home.

42.     Thus, the bare bones warrant application in this case removed any notion that there was probable cause to believe that the specific items sought would be at 10 35th Street in particular.  Because the Defendants knew — but deliberately hid from the issuing judge — that there were numerous alternative places in which their "training" and "experience" taught that the evidence they sought was likely to be found, their own assertions completely undermine any probable cause to believe that Queen's home would contain any evidence of a crime.

### The Unknown Date of the Initial Stop Defeats Any Notion of Probable Cause to Search the Home

43.     Without a specifying date on the search warrant application, it is impossible to tell when the street stop of Reginald Bailey occurred.  The stop might have occurred weeks, months, years, or even decades before MPD officers raided Romone Queen's home.

44.     Because there is no way to verify the amount of time between the street stop and the home raid, it is impossible to show that at the time of the raid, Defendant Reuter's assertions of concealed "narcotics, drug paraphernalia, money, records, personal papers, proof of residency, photographs, drug packaging materials, evidence of the accumulation and disposition of proceeds of narcotics trafficking and any illegal weapons" were still relevant and valid.

45.     Because of the transportable nature of the above-mentioned items and the illicit and transitory nature of narcotics dealing, it is entirely possible that evidence of drug distribution might change locations easily and frequently.  Even more likely, an individual recently arrested on suspicion of drug charges could foreseeably move evidence of their narcotics operation to a new, safer location soon after their arrest.  That individuals in low income neighborhoods often

change leases and move residences further illustrates the importance of lapsed time when assessing a warrant application's relevance.  A prolonged period between a street stop and a subsequent home raid necessarily erodes any notion of probable cause.

46.     Without knowing how much time had passed since the street stop, it was impossible to know if probable cause still existed to search a premises seemingly connected with the indeterminate street stop.  The warrant application made and relied on by Defendants therefore lacked a logical basis and no reasonable officer could have believed that it established probable cause to search Queen's home.

**The Warrant Relied on False and Misleading Statements and Omissions**

47.     In addition to failing to establish any particularized probable cause justification to raid the Queen home, Defendant Reuter's generic and conclusory statements of "training" and "experience" were false and misleading.  Defendant Reuter omitted to tell the Superior Court judge that when MPD officers execute such warrants after a traffic or street stop based only on their "training" and "experience" rather than actual evidence connecting the home to criminal activity, the warrant returns submitted by officers themselves prove that MPD officers *do not* find the items that they seek in the vast majority of cases.

48.     For example, examining all of the "training" and "experience"-based warrants in a one-year period near the raid in this case in which MPD officers sought to search a home based solely on assertions that a drug criminal would keep drugs at home, police officers failed to find any drugs, let alone the drugs they were looking for, in almost 66% of the cases.

49.     The statistics are even worse considering that the large majority of home drug raids found not what MPD officers claimed that they would find, but turned up only small, personal amounts of marijuana.  If small amounts of marijuana are excluded, MPD officers failed

to find illegal drugs that they were purportedly searching for in nearly 87% of the cases.

50.     According to the Department of Health and Human Services, the rate of illegal drug usage by D.C. residents aged 12 and older is 13.6%, including 11.2% for marijuana use alone.[3]

51.     Considering the significant usage rate of illicit drugs in all areas and across all demographics of the District, the MPD's success rate in "training" and "experience"-based home raids (i.e., raids seeking to search a home without any particularized facts linking the home to criminal activity) is closer to what one would expect to find in random searches of homes occupied by D.C. families.

52.     The statements of "training" and "experience" to the Superior Court judge thus knowingly and recklessly omitted from the judge the poor success rate of such warrants.  It is the duty of the police officer swearing the warrant to inform the judge that the claims being made are not true and not substantiated by information collected by the MPD officers themselves.

53.     Statements under oath to a judge about what drug dealers "usually" or "commonly" or "habitually" do are especially misleading when MPD officers possess information that contradicts those vague statements of "experience."  By depriving the issuing judge of an accurate picture, Defendant Reuter denied the neutral arbiter the ability to make a properly informed probable cause determination.

54.     In this case, Defendant Reuter ultimately swore to the issuing judge that additional drugs, weapons, ammunition, records, and proceeds of sophisticated drug sales would likely be found at the 10 35th Street home but omitted to tell the judge that, based on his and the MPD's actual experience in such "training" and "experience"-based raids in the District, it was

---

[3] http://www.samhsa.gov/data/NSDUH/2k11State/NSDUHsae2011/ExcelTabs/NSDUHsaeTables2011.pdf   (Table1 and Table 3).  The usage rates are significantly higher for those 18 and older.

far more likely that *no such evidence* would be found.   These are critical facts that any reasonable judge would need to know before authorizing what is among the most intrusive, traumatizing, humiliating, and dangerous actions undertaken by any government.

55.     Defendant Reuter also sought to broaden the search of 10 35th Street home beyond illegal drugs to examine all of the papers, notes, and records that might be found in the family's home.   To do so, he asserted that his "training" and "experience" meant he knew individuals like Mr. Bailey maintained a laundry list of papers and records, including "notes, ledgers, bank records, money orders, and other papers" and a wide variety of documents reflecting the "importation" and "ordering" and "manufacturing" and "transportation" of illegal drugs, including but not limited to "telephone records," "photographs," "address books," and "credit card and hotel receipts." *See generally id.* at 1–2.

56.     In his attempt to expand the search authorization to the most private items in Romone Queen's home and to circumvent the requirements of the Fourth Amendment, Defendant Reuter claimed the records he sought were commonly maintained by "traffickers" on "computers, cellular telephones, PDAs often called "Palm Pilots," and laptop computers and other personal electronic devices." *Id.* at 1.

57.     To bolster his attempt to search every corner of the Queen home, Defendant Reuter claimed he knew individuals like Mr. Bailey possess contraband related to the manufacture of crack cocaine as well as "weapons as a means to facilitate their illegal drug activities." *Id.* at 2.   Defendant Reuter failed to provide even a single particularized fact connecting Mr. Bailey or the Queen home to crack cocaine manufacturing.

58.     Defendant Reuter knew that it is extremely rare (if ever) that such "training" and "experience"-based home raids in the District of Columbia yield any such items or documents

and records of drug distribution.  In the one-year period surrounding and including the raid of the Plaintiffs' home, MPD officers failed to locate such documents or other records related to a drug distribution enterprise in over 99% of such street-stop "training and experience"-based raids.

59.     During the same period, records produced by MPD officers show that 91% of such warrants searching for guns in the District failed to find any guns in the home.

60.     Defendant Reuter, in an attempt to expand the search authorization from drugs to any and all private documents, papers, electronics and bank records in the house, omitted to inform the issuing judge of the abysmal success rate of MPD officers locating such documentation in "training and experience"-based home raids.

61.     This record of failure is not surprising given how Defendant Reuter misled the judge.  The warrant application left the issuing judge with the false impression that all "persons involved in illegal controlled substances" share the same habits as sophisticated drug kingpins and that all "drug traffickers" share the same relevant habits. *See supra* n. 2.  For example, the warrant application painted a picture of Mr. Bailey — based on finding cigarettes and cash on his person and a small vial of a substance similar to PCP — as one of those "drug traffickers" who must keep sophisticated banking records, money orders, ledgers, hotel and plane receipts, precious metals, jewelry, and other evidence of a drug importation or distribution ring in his residence.

62.     The Defendants knew, however, based on their training and experience, that many of those engaged in street-level drug selling in the District — those who are the vast majority of "drug traffickers" that MPD officers arrest — possess "habits" that are nothing like the sophisticated operations described in the warrant application.

63.     Defendant Reuter knew, but did not report, that street-level drug sellers, to the

extent that officers even had evidence that Mr. Bailey was one of them, are utterly unlikely to possess the various specific items sought in the search warrant in their homes or even in the homes of friends or relatives or associates.

64.     The Defendants also knew that big-time drug traffickers who operate distribution rings have very different habits from those who sell small amounts of PCP on the street.  The Defendants knew that drug-trafficking leaders and managers rarely trust lower level dealers with financial records, customer logs, distribution chain information, money, or even drug stashes.

65.     None of this knowledge was presented to the judge in this case, who was instead left with the impression that any person accused of selling PCP-dipped cigarettes on the streets would be keeping "ledgers," "receipts," "financial instruments," and "bank records" in an easily accessible place such as his residence.

66.     More specifically, the sworn affidavit makes no attempt to distinguish between the "habits" of indigent low-level street dealers and those of successful drug kingpins and traffickers.  That wealthy kingpins might keep sophisticated paper or electronic records and suitcases of cash says nothing about whether indigent street-level dealers, who constitute the vast majority of MPD arrests and prosecutions, do the same.  To the contrary, experienced MPD officers like Defendant Reuter know that different classes of dealers have dramatically different business models and practices.  In truth, the sophisticated items that Defendant Reuter's "experience" dictated should be present in the home of an individual who "deal[s] in illegal controlled substances" are almost never found in MPD searches, and other items (like more drugs) are far more likely *not* to be found in a search like the one at hand.  Defendant Reuter twisted his "training" and "experience" regarding the habits of sophisticated drug kingpins to mislead the judge to believe that his assertions applied to the vast majority of citizens D.C. police

are actually seeking search warrants for — low-level indigent street dealers.  By combining these groups in his sworn affidavit, Defendant Reuter misled the issuing judge about the person *actually involved in the investigation before the judge at that moment*.

67.     Moreover, Defendant Reuter and the other Defendants planning and executing the home raid were trained that drug criminals often choose not to hide evidence at their own homes and often give to police addresses that they know are "clean."

68.     Defendant Reuter did not inform that Superior Court judge that it is a common practice of those that the MPD categorically labels "drug traffickers" to give addresses of friends or family who they know to be "clean" when police ask for an address. [4]

69.     Defendant Reuter made reckless and knowingly misleading statements in his attempt to raid the Queen home and gain access to the most intimate parts of the couple's life. The warrant application's vague, general, and conclusory statements of "training" and "experience" were not only woefully insufficient to establish probable cause to search Queen's home, they were also knowingly false, incomplete and misleading.

**The Violent Raid of Queen's Home**

70.     Shortly after 5:30pm on October 25, 2013, approximately 10 heavily armed MPD officers stormed 10 35th Street SE.

71.     When the Defendants arrived, Octavia Mercer was home alone at her boyfriend's apartment, where she was briefly staying while in between apartments.  The Defendants banged loudly on the front door and identified themselves.  Scared and alone, Mercer placed a call to Queen as she went to open the door.  Before Mercer had opened the door more than two inches,

---

[4] Defendant Reuter also failed to inform the judge that people stopped by the MPD often stay at multiple residences and are otherwise transient.  Other police officers have, when it serves their interests, sworn to this fact in other warrant applications to different judges.  Moreover, it is also "common experience" that many people, especially low-income people without stable finances or those with many family members in different locations, will "stay" at multiple residences.  *See, e.g.*, 2013-CRW-1369 ("It is not uncommon for individuals to live between places.").

MPD officers violently thrust the door onto her, knocking her to the ground.  Officers tackled and pinned Mercer down as they ran over her and into the house with handguns and large assault weapons drawn.

72.     Defendant MPD officers forcibly handcuffed Mercer, screaming and yelling epithets as they placed her in the center of the room without explanation.  Male officers filled the home and stood over Mercer and aggressively questioned her.  They leaned inches from her face, accused her of lying, threatened her with jail and accused her of being "guilty by association."  At no point did Mercer resist or do anything aggressive or threating to the officers.   The Defendants continued to keep her in handcuffs and kept their loaded guns drawn even though it was clear she posed no legitimate threat.

73.     Officers aggressively questioned Mercer about Reginald Bailey, whom she had never met and whose name she did not recognize at first.  Defendant officers would not relent even though Mercer knew nothing about Bailey's personality, whereabouts, or habits.  Defendant officers then claimed to have found a marijuana-like substance in a Samsung box in Queen's closet, although it was never shown to Mercer.

74.     Mercer repeatedly asked to see a warrant and Defendant officers refused to respond.

75.     Officers searched through Queen's office area where he runs his IT business.  The Defendants thoroughly searched through all of Queen's personal computer files for five to ten minutes.  Officers then knocked the computer over and tossed containers of computer hardware equipment, breaking much of the equipment beyond repair.  Officers continued to ransack the home, ripping apart bags, breaking dishes, destroying furniture, and throwing around precious books belonging to Queen's deceased mother.

76.    As Queen returned from work he was immediately handcuffed and prevented from entering his apartment.  Defendant MPD officers told Queen to confess to ownership of marijuana or else his girlfriend would be arrested; in the alternative, he was told to sign a statement confessing his brother's ownership of the marijuana or else he would "rot in jail."

77.    Queen repeatedly asked to see a warrant and Defendant officers refused to respond.

78.    Mercer and Queen were taken into custody and held in jail until 2am.  They were put in solitary confinement and spent approximately nine hours without water or access to bathroom facilities.

79.    Mercer and Queen were peaceful and non-threatening to officers from the moment the front door was broken down and the home was overrun with armed officers.

80.    The Defendants violently tore apart the house, far beyond what would have been necessary to search for drugs, weapons, guns, or records.  It took the couple days of laboring to clean up their belongings.

81.    The home invasion was traumatizing and humiliating for the couple.  To this day, Plaintiffs experience emotional difficulty and anxiety when recalling the event.

82.    Mercer was initially charged with possession of marijuana, which was later dismissed.  As a result of the charge however, Mercer was "red flagged" at her job at United Cerebral Palsy. Mercer was consequently demoted and given fewer hours at work. She was eventually forced to leave the job because she was not being given enough hours to support herself.

83.    After the violent and invasive home raid, the Office of the Attorney General sent a letter to Queen's rental agency in an attempt to have him evicted from his home.  Queen had to

spend a significant amount of time and effort to prove he had done nothing wrong, and to avoid losing his apartment.

84.     Mercer and Queen had no knowledge that Mr. Bailey possessed or sold illegal narcotics.

### "Training" and "Experience"-Based Raids in the District of Columbia

85.     Over the past several years, the Metropolitan Police Department has adopted an aggressive addition to its traditional search warrant practices.  The MPD has expanded the number of armed home raids by establishing a pattern, custom, and practice of seeking search warrants for a person or family's home without *any* specific connection between that home and any illegal activity.  According to this approach, MPD officers are trained to search homes based solely on street stops resulting from the seizure of certain types of contraband.

86.     If officers lack any facts traditionally used to establish a connection to a home (such as a controlled buy, a confidential informant, witness statements, interrogations, police observations and surveillance, or physical evidence), the MPD has trained its officers to make vague, entirely unsubstantiated, and knowingly reckless and false statements of "training" and "experience" about the habits of "criminals."

87.     In such non-evidence, "experience"-based home raids, officers will typically search a person incident to an arrest.  If the person has contraband, officers will ask the person where he or she lives or examine their drivers' license.  Days or weeks later, a team of heavily-armed officers will raid the residence (or sometimes multiple residences) based on assertions that the criminal must have further evidence of his or her crimes at the residence.

88.     In such cases, the MPD thus effectively turns searches incident to arrest into searches of entire homes incident to arrest.

89.     In the one-year period surrounding the execution of the warrant in this case, MPD officers (including dozens of officers and supervisors from police districts throughout the City) employed materially similar statements based on the MPD's "training" and "experience" concerning people who possess drugs in order to obtain and execute at least 81 home search warrants resulting from incidents in which police claimed to find drugs during a street stop, but presented no other evidence linking the home to any criminal activity.

90.     MPD officers are trained by the MPD to substitute these and materially similar statements of "training" and "experience" for particularized facts when they want to search a particular location but lack any actual facts connecting the location to any criminal activity.[5]

91.     An examination of hundreds of MPD warrant applications from the one-year period surrounding the application to search 10 35th Street reveals not only material inconsistencies and numerous facially invalid warrants, but also a systemic lack of evidentiary rigor.  Much of the enterprise is based on interconnected falsities and reckless omissions — calculated and used by MPD officers to gain entry into the most intimate areas of people's lives when the particularized evidence does not support such extreme intrusions.

92.     Examining MPD warrant applications and inventory returns in bulk reveals a police department that not only tolerates this systemic behavior but that has affirmatively trained its officers to make specific sworn assertions of expertise like the ones made by Defendant Reuter, even though the MPD and its officers know the assertions being made are false, unsubstantiated by the evidence that the MPD itself collects, self-defeating, or grossly

---

[5] This systemic pattern extends beyond drug cases.  For example, in dozens of warrant applications, MPD officers assert that they will find additional firearms or firearms-related accessories at a home based solely on a street arrest of a person possessing a gun, even though MPD officers know that they are overwhelmingly unlikely to find that evidence in those home raids.  These warrant applications often contain assertions about particular items that are flatly contradicted by other warrants purportedly based on the same "training" and "experience."

In total, during the one-year period surrounding and including the raid in this case, MPD officers executed similar home search warrants based solely on statements of "training" and "experience" after finding contraband during a street arrest in 130 cases.

misleading to the issuing judge.

93.    Even though MPD officials and officers know that violent home raids in which government agents rifle through an entire lifetime's worth of a family's most intimate possessions are among the most intrusive, frightening, demeaning, and traumatizing experiences to which a government can subject its citizens, the MPD has failed to establish proper training and supervision policies to ensure that its officers engage in such raids for valid reasons.

94.    The MPD has employed increasingly violent, unnecessary, and devastating force in executing those warrants — even warrants in which there is no threat of violence and even when it is apparent that there is no risk of harm to officers.  Added to the enormous intrusion on privacy inherent in home searches is now the violent force of special militarized MPD units, armed with laser-sighted weapons, machine guns, flash grenades, and shields.

95.    Approximately 91% of all drug arrests in the District of Columbia are of African-Americans, even though African-American residents and Caucasian residents use illegal drugs at the same rates.   On information and belief, the racial demographics of "training" and "experience"-based home raids are even more disproportionately African-American.

96.    Counsel for Plaintiffs has conducted an extensive random sample investigation of "training" and "experience" based warrants throughout D.C., including many dozens of interviews.  Counsel has yet to locate a single example of such a home invasion that did not involve a family of color.

### Claims for Relief

**One:  The Warrant Application Was so Lacking in Probable Cause that No Reasonable Officer Could Have Relied on It in Good Faith.  Reliance on the Warrant Application Violated the Fourth Amendment.**

97.    Plaintiffs incorporate by reference the allegations in paragraphs 1–96 above.

98.     Defendants obtaining, planning, and executing the search warrant for the Plaintiffs' home relied on a warrant application that was so facially lacking in probable cause that no reasonable officer could have relied on it in good faith to search Romone Queen's home. The warrant application utterly failed to provide any evidence linking the home to any criminal activity, let alone to establish probable cause that the specific items sought would be found there. The application's assertion of a sophisticated crack cocaine manufacturing and distribution operation was woefully lacking both a logical basis and any shred of particularized evidence linking the 10 35th Street home to any such activity.   The warrant application's self-defeating statements of "training" and "experience," which identified numerous possible locations other than 10 35th Street (such as "their residence, the residences of friends, family members, and associates, or in the places of the drug distribution activity, such as a stash house or safe house") demonstrated that the Defendants had no reliable idea whether any evidence would be found at 10 35th Street residence in particular.

99.     The unknown date of Reginald Bailey's street stop defeats any notion of probable cause that existed to search Romone Queen's home.   Because the warrant application recklessly omits a date, it is impossible to tell whether the street stop occurred within the same week, month, or even the same year as the home invasion that it supposedly authorized.   No reasonable officer could have believed that a home invasion was relevant or reasonable based solely on a street stop that occurred on an unknown date some time in the past.

**Two:   The Warrant Application Contained Statements that Were Knowingly and Recklessly False and Made Material Omissions**

100.     Plaintiffs incorporate by reference the allegations in paragraphs 1–99 above.

101.     The warrant application presented to the Superior Court judge contained numerous statements of "training" and "experience" that were knowingly and recklessly false

and misleading.   The warrant also omitted material facts known to Defendant Reuter that, if presented, would have undermined the asserted basis for seeking the warrant, including the fact that the vast majority of "knowledge" and "experience"-based searches fail to uncover records, ledgers, bank statements, electronic files, or even the drugs and weapons sought by the MPD. The Fourth Amendment prohibits obtaining a warrant on the basis of knowingly and recklessly false and misleading assertions as well as the knowing and reckless omission of material information that would undermine a probable cause finding.

**Three:   The Warrant Was Clearly Overbroad Such that No Reasonable Officer Could Have Executed the Warrant In Good Faith.**

102.   Plaintiffs incorporate by reference the allegations in paragraphs 1–101 above.

103.   The Fourth Amendment requires that search warrants and applications state with particularity the things sought to be recovered and the probable cause to justify a belief that those particular items will be present in the place to be searched.   The warrant executed by Defendants purportedly sought numerous items, including items never described in the warrant application and items for which no justification was presented in the warrant application.   For example, nothing in the warrant application authorized or justified the seizure and search of money, personal papers, proof of residency, precious metals, jewelry, photographs, computers, cell phones, palm pilots, microwave ovens, dishes, credit card receipts, or of a variety of other items and documents that permitted officers raiding the home to search through all of the most intimate paper and electronic details of the couple's life.

**Four: The Obvious Lack of Probable Cause and False and Reckless Statements and Omissions Were the Result of a Policy, Pattern, and Custom of Such Conduct by the MPD and the Result of the MPD's Failure to Properly Train and Supervise Its Officers.**

104.   Plaintiffs incorporate by reference the allegations in paragraphs 1–103 above.

105.   The MPD has established a pattern, policy, and practice of training its officers to

include in search warrant applications statements of "training" and "experience" that are unsubstantiated, vague, self-defeating, recklessly misleading, and woefully insufficient to substitute for actual evidence.   The MPD has established a pattern, policy, and practice of providing boilerplate language that contains insufficient, false, and reckless statements of "training" and "experience," and training its officers to use and rely on such statements concerning the habits of minor drug offenders and other offenders stopped on the street as a purported substitute for any actual evidence or police investigation into any evidentiary link to a particular residence.   According to the warrant returns and warrant applications prepared, collected, and retained by the MPD, this pattern, policy, and practice is implemented by officers pursuant to their training in many dozens of cases each year, in which MPD officers have not obtained a single piece of actual evidence linking a residence to any illegal activity.   The MPD has failed to train or properly supervise its officers on the Fourth Amendment standards for performing highly intrusive home raids.

**Six:   Officers Raiding the Home Used Excessive Force and Made Unnecessary and Unreasonable Seizures in Violation of the Fourth Amendment.**

106.    The Plaintiffs incorporate by reference the allegations in paragraphs 1–105 above.

107.    The MPD officers raiding the home unlawfully searched the home and its occupants and used unnecessary and excessive force.   The Defendants tackled Octavia Mercer to the ground and held her down even though she was not a target of the raid and posed no legitimate threat.   MPD officers then proceeded to repeatedly accuse, threaten and demean both Mercer and Queen even though they were both calm and never threatening.   The couple was forced to endure solitary confinement for approximately nine hours without water or access to bathroom facilities.   No reasonable officer could have believed that Mercer and Queen, individuals clearly not involved in an illegal narcotics enterprise, deserved or necessitated such

excessive treatment.

## Request for Relief

WHEREFORE, Plaintiffs request that this Court issue a judgment against the Defendants:

a.      Holding the appropriate Defendants liable to the Plaintiffs for compensatory damages in

an amount appropriate to the proof adduced at trial;

b.      Holding the appropriate Defendants (other than the District of Columbia) liable to the

plaintiffs for punitive damages in an amount appropriate to the proof adduced at trial;

c.      Awarding to Plaintiffs their costs and reasonable attorneys' fees; and

d.      Granting such other and further relief as the Court deems just and proper.


                                        Respectfully submitted,

                                        */s/ Alec Karakatsanis*
                                        Alec Karakatsanis (D.C. Bar No. 999294)
                                        Phil Telfeyan (D.C. Bar Application Pending)
                                        Equal Justice Under Law
                                        916 G Street NW, #701
                                        Washington, D.C. 20001
                                        (202) 681-2409
                                        *Attorneys for Plaintiffs*

Date: September 17, 2015